[Cite as *State v. Brickman*, 2023-Ohio-2031.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

CHARLES P. BRICKMAN,

        Defendant-Appellant.

**CASE NO. 2022-L-065**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2021 CR 000415

**O P I N I O N**

Decided: June 20, 2023
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Edward M. Heindel*, 2200 Terminal Tower, 50 Public Square, Cleveland, OH 44113 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Charles P. Brickman, appeals his convictions for Breaking and Entering, Burglary, Menacing, and Criminal Damaging or Endangering in the Lake County Court of Common Pleas. For the following reasons, Brickman's convictions are affirmed.

{¶2} Between May 3 and 5, 2022, Brickman was tried before a jury on the following charges: Breaking and Entering (Count 1), a felony of the fifth degree in violation of R.C. 2911.13(B); Vandalism (Count 2), a felony of the fifth degree in violation of R.C.

2909.05(B)(1)(a); Burglary (Count 3), a felony of the third degree in violation of R.C. 2911.12(A)(3); Burglary (Count 4), a felony of the third degree in violation of R.C. 2911.12(A)(3); Menacing (Count 5), a misdemeanor of the fourth degree in violation of R.C. 2903.22; and Criminal Damaging or Endangering (Count 6), a misdemeanor of the second degree in violation of R.C. 2909.06(A)(1). The following testimony and evidence were presented at trial:

{¶3} Patrolman Kevin Rastall of the Willoughby Police Department testified that, on July 30, 2020, he was dispatched to 37819 Euclid Avenue (Van Gorder Manor[1]) in response to reported property damage. Rastall noted that the mailbox had been twisted off its post; several windows had holes in them and rocks were found inside the building; and there was a hose connected to an outside spigot that was left running in the foyer which had damaged the flooring and flooded the basement.

{¶4} Kevin Meade testified that, in the early morning hours of July 30, 2020, he was returning home when he observed an "average-looking" white male, without a shirt, throwing things into River Road in Willoughby. Meade reported this to the police.

{¶5} Christopher Peterson testified that he used to manage a property for Brickman on Euclid Avenue in Willoughby, known as the (Moore) Rooming House, a three-story building that housed between 10 and 12 tenants. In the summer of 2020, one of the tenants was Larry Rentschler. Brickman was upset with Rentschler because he had been "talking shit" about him. One day that summer, Peterson spent the afternoon and early evening drinking with Brickman in downtown Willoughby. Early the next day,

---

1. The incident involving the Van Gorder Manor forms the basis for the charges of Breaking and Entering (Count 1) and Vandalism (Count 2).

Case No. 2022-L-065

Rentschler called Peterson and told him that his van had been damaged. Peterson went to the property and saw that one of the windows on the van, as well as one of the windows of the rooming house, had been smashed by a red concrete brick. Brickman kept a pile of red bricks behind the garage on the property. Peterson tried throughout the day to contact Brickman about the damage on his cell phone (XXX-3685), but Brickman did not answer the calls. Sometime after that, Brickman agreed to reduce Rentschler's rent to compensate for the damage to his van.

{¶6} Laura Krus testified that, in the summer of 2020, she owned the Van Gorder Manor and was renovating it with the intention of moving into it with her husband. On July 30, she visited the property to see if it had been damaged by storms the previous evening. She noticed the broken windows and contacted the police. Krus testified that the cost of repairing the damage was over one thousand dollars.

{¶7} John Schultz testified that, in July 2020, he was living at 37931 Euclid Avenue in Willoughby, known as the Moore rooming house. Late in the evening of July 29 and/or the early morning of July 30, Schultz heard a window break in one of the common rooms of the house. Schultz contacted the police. Unexpectedly, Brickman came into the house. He was belligerent, noticeably intoxicated, shirtless, and drenched. Schultz had only seen Brickman at the property during the day when something needed to be fixed, never at night.

{¶8} Larry Rentschler testified that, in July 2020, he was living at the Moore Rooming House. Early in the morning of July 30, 2020, he was awoken by the sound of a window breaking in the kitchen, but returned to sleep. At 5:00 a.m., he awoke again for work. He discovered that the driver's side window on his van had been smashed with a

3

red brick, the windshield was cracked, and the sideview mirrors, wiper blades, and antenna were damaged[2].

{¶9} Patrolman Kyle Bucher of the Willoughby Police Department testified that, on June 23, 2020, at about 10:20 p.m., he responded to a reported disturbance at 38209 Wilson Avenue[3] in Willoughby, the home of Deidre Spinello. He noted that "the windows around the perimeter of the house appeared to be tampered with." One of the windows had its screen removed. The window had been pushed in and a hose connected to an outside spigot had been put inside the window. There was water on the floor of the home. There was also writing in black marker ("I♡U" and "COKE") on the side of the house and on a vehicle parked in the driveway. Bucher testified that, in seven years of law enforcement, he had not seen similar damage to a house.

{¶10} Patrolman Jackson Hyams of the Willoughby Police Department testified that, on the afternoon of July 30, 2020, he was called to 38209 Wilson Avenue[4]. He noted that three star-shaped lawn ornaments and a solar-powered garden light had been moved to the front porch of the home; two other garden lights had been stabbed through window screens on the side of the house; the screen to the kitchen window was torn and a hose connected to an outside spigot had been put in the window; and the window to the back door of the house had been smashed with a rock. Hyams testified that, in eight years of law enforcement, the only instances he had encountered of a hose being left inside a house were those of June 23 and July 29-30.

---

2. The damage to Rentschler's van constitutes the basis for the charge of Criminal Damaging (Count 6).
3. The July 23 incident at the Wilson Avenue property constitutes the basis for the charge of Burglary (Count 3).
4. The July 30 incident at the Wilson Avenue property constitutes the basis for the charge of Burglary (Count 4) and Menacing (Count 5).

Case No. 2022-L-065

{¶11} Deidre Spinello testified that through her work with Puppy Realty she has known Brickman since about 2013. She helped Brickman manage the Moore Rooming House. Around 2018-2019, she began to rent the house at 38209 Wilson Avenue from Brickman. In November 2019, she learned that the Wilson Avenue property was in foreclosure. She decided to cease her dealings with Brickman, vacated the home and quit managing the Rooming House. Brickman was upset with her and wanted her to pay rent for December which she refused to do. In the spring of 2020, after the Wilson Avenue property had been sold at sheriff's sale, she moved back into the house renting from the new owner.

{¶12} On the evening of June 23, 2020, Spinello was at home upstairs and heard noises which frightened her. She went downstairs and discovered water pouring into her living room and contacted the police. On July 30, 2020, Spinello discovered additional damage to the home after returning there in the morning (having spent the night elsewhere). She believed Brickman damaged the property because their relationship ended badly, she had moved back into the Wilson Avenue residence, and because of "the way he spoke and [the] things that he would say * * * his reaction when things didn't go his way."

{¶13} Lydia Hoogerhyde, a civilian employee with the Ohio State Patrol's intelligence unit, testified that she assists law enforcement in cell phone mapping investigations. The Willoughby Police Department submitted cell phone records associated with the number XXX-3685. Using TRAX mapping software, Hoogerhyde was

5

able to place the device associated with the number within an area[5] ("the horizontal plane") that included 38209 Wilson Avenue between 10:00 p.m. and 10:30 p.m. on June 23, 2020. Hoogerhyde determined that, between 10:00 p.m. and 11:00 p.m. and 11:30 p.m. and 11:59 p.m. on July 29 and between 12:00 a.m. to 1:00 a.m. and 1:30 a.m. to 3:00 a.m. on July 30, the device was within a similar geographical area encompassing 38209 Wilson Avenue and the Van Gorder Manor.

{¶14} Patrolman Matthew Jackson of the Willoughby Police Department testified that, at about 4:30 a.m. on July 30, 2020, he issued an overnight parking citation to a Jeep Wrangler registered to Brickman. The vehicle was parked in a reserved area of the city hall parking lot, perpendicular to the parking lines, so that it occupied two spaces. At about 6:30 a.m., the vehicle was towed at the request of a municipal employee.

{¶15} Sarah Varhola, a forensic scientist in the latent print section of the Ohio Bureau of Criminal Investigation, analyzed a print taken from one of the star-shaped ornaments from the Wilson Avenue residence and determined that it matched the print from Brickman's right middle finger.

{¶16} Detective Gabriel Sleigh of the Willoughby Police Department testified that between about 12:20 p.m. on July 29, 2020, and 1:20 a.m. on July 30, there were a number of disturbance calls to the police department. There was a report of someone pulling furniture into the road at 4309 River Street (Meade's report) as well as the incident at the Moore Rooming House. The following day the incidents on Wilson Avenue and at

---

5. The area roughly encompasses central Willoughby from Timberlake to Waite Hill (north to south), and State Route 91 to State Route 306 (east to west).

Case No. 2022-L-065

the Van Gorder Manor were reported.  Sleigh noted that all four points of interest were in relatively short walking distance from each other.

{¶17}  Detective Sleigh developed prints from the lawn ornaments which he submitted to the Lake County Crime Lab.  The Lake County Crime Lab did not find enough detail in the print for analysis.  Thereafter he submitted the prints to BCI for another opinion.

{¶18}  In September 2020, Detective Sleigh attempted to make contact with Brickman, initially at his home in Willoughby Hills.  Afterwards (March 2021), Sleigh did speak with Brickman regarding the incidents.  Brickman denied any involvement.  He said he had not been at the Wilson Avenue residence for five years.  When asked about his vehicle, Brickman claimed that a friend was using it.  When Sleigh raised the possibility of there being surveillance video, Brickman admitted to using the car with a friend in downtown Willoughby.

{¶19}  Raymond Jorz, the supervisor of the latent print and firearm section of the Lake County Forensic Crime Laboratory, testified that he did not process the lawn ornaments submitted to the Lab for latent prints because of their poor condition ("they were dirty, they were weathered").  Nor did he consider the latent prints processed by Detective Sleigh to contain sufficient information for analysis.

{¶20}  The jury returned guilty verdicts on all six counts.  The trial court imposed the jointly recommended sentence that Brickman serve, concurrently, four years of community control for each count and pay restitution to Spinello in the amount of $1,000 and to Rentschler in the amount of $100.  Brickman's sentence was memorialized in a Judgment Entry of Sentence on June 29, 2022.

7

{¶21} On July 18, 2022, Brickman filed a Notice of Appeal. On appeal, he raises the following assignments of error:

[1.] The convictions were not supported by sufficient evidence.

[2.] The convictions were against the manifest weight of the evidence.

{¶22} Brickman does not contend that the State failed to prove that the basic elements of the crimes were committed as charged. Rather, his challenge under both assignments of error is that the State failed to prove that he was the person who committed the crimes.

{¶23} With respect to identity, the Supreme Court of Ohio has held:

Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. The truism is reflected in the state's constitutional burden to prove the guilt of "the accused" beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991). The relevant question in a sufficiency-of-the-evidence review is whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have the essential elements of the crime proven beyond a reasonable doubt." *Id.* at paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15

{¶24} This court had adopted the definition of "circumstantial evidence" as "evidence not grounded on actual personal knowledge or observation of the facts in controversy, but of other facts from which inferences are drawn, showing indirectly the facts to be established." (Citation omitted.) *State v. Jones*, 11th Dist. Lake No. 2019-L-056, 2020-Ohio-3852, ¶ 28; *also State v. DeGenero*, 2017-Ohio-624, 85 N.E.3d 170, ¶ 18 (11th Dist.) ("[c]ircumstantial evidence * * * is proof of facts or circumstances by direct

8

evidence from which (the fact finder) may reasonably infer other related facts which naturally and logically follow according to the common experience of mankind") (citation omitted). "[T]he state can establish facts through circumstantial evidence only insofar as reasonable inferences can be drawn from that evidence." *DeGenero* at ¶ 18. Examples of circumstantial evidence to show identity include the defendant's presence or fingerprint at or near the crime scene, as well as the motive and opportunity to commit the crime. *State v. Sanders*, 11th Dist. Lake No. 2011-L-024, 2012-Ohio-400, ¶ 39 ("[i]dentification of the shooter is not necessary when there is circumstantial evidence of appellant's presence at the scene during the time of the incident"); *State v. Reese*, 2d Dist. Montgomery No. 20246, 2004-Ohio-6674, ¶ 15 ("[t]he identity of the perpetrator may be proved by circumstantial evidence, such as a fingerprint found at the crime scene"); *State v. Reddy*, 10th Dist. Franklin No. 09AP-868, 2010-Ohio-3892, ¶ 18 ("reasonable minds could conclude that appellant had the opportunity and motive to set Copeland's car on fire and, therefore, was the person who set Copeland's car on fire").

{¶25} A defendant's guilt, and thus his identity, may also be inferred from the defendant's conduct to avoid being implicated in a crime such as providing a false alibi, concealing evidence, or otherwise lying about his involvement. *State v. Robinson*, 6th Dist. Lucas No. L-06-1182, 2008-Ohio-3498, ¶ 202 ("[t]he law is clear that lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself"); *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 54 (where his statement to the police was contradicted by physical evidence, "[t]he trier of fact was at liberty to infer consciousness of guilt from Williams's lie").

9

**{¶26}** Finally, it is well-established that other acts of a similar nature or character can be used to establish identity. Evid.R. 404(B). "A certain *modus operandi* * * * provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator." *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994); *State v. Morris*, 2012-Ohio-6151, 985 N.E.2d 274, ¶ 18 (9th Dist.) ("evidence of a scheme, plan, or system tends to prove the identity of the perpetrator either because the other act is part and parcel of the plan to commit the charged crime or because the other act is so similar to the crime charged and sufficiently idiosyncratic that it tends to prove the same person committed both acts"). "To be admissible to prove identity through a certain *modus operandi*, other-acts evidence must be related to and share common features with the crime in question." *Lowe* at paragraph one of the syllabus.

**{¶27}** As to sufficiency, Brickman asserts that "nobody observed [him] doing any of [the things for which he was convicted]." Brief of Appellant at 14. Spinello's suspicions that Brickman might have been responsible for the damage were vague and inchoate. The cell phone evidence was of little consequence since Brickman manages properties in Willoughby and has lived there in the past. Nor is the fingerprint on the lawn ornament significant since he frequented the property often. We disagree.

**{¶28}** Brickman's convictions stem from four incidents involving three victims (Spinello, Rentschler, and Krus) on two occasions. The three locations at which the incidents took place, as well as the location of Brickman's vehicle on the morning of July 30, 2020, are in close proximity, i.e., they are within a few thousand feet of one another. All of the incidents except one took place on the night of July 29-30, with the other incident

10

taking place about a month earlier. In all of the incidents, windows were smashed by throwing a brick or rock through them. In three of the four incidents, a hose was inserted into a window and left running. It is readily inferable that the same person was involved in all four incidents.

{¶29} Likewise, it is inferable that Brickman was that person. Brickman was in the area on the evening of July 29-30. He was present at the Moore Rooming House shortly after the time its window was smashed. He was belligerent and intoxicated and observed acting erratically. Although he owned the Rooming House, he did not manage it directly and was not typically there in the evening. Brickman's fingerprint on the lawn ornament places him at Wilson Avenue at about the same time although it is not known exactly when the lawn ornament was moved to the front porch. Notably, the fingerprint contradicts Brickman's statement that he had not been to the property for about five years. There was evidence of Brickman having animus toward two of the three victims.

{¶30} The evidence in the record, albeit circumstantial and varied, is sufficient to convince a rational trier of fact that, beyond a reasonable doubt, Brickman committed the crimes charged. The first assignment of error is without merit.

{¶31} In contrast to sufficiency of the evidence, which is "a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "[A] reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* An appellate court must consider all the evidence in the record, the reasonable inferences,

11

the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387.

{¶32} With respect to the weight of the evidence, Brickman reiterates that he was "never identified as the perpetrator of any of this" and that Spinello's suspicions only amount to a "generalized hunch." Brief of Appellant at 16. Again, we disagree.

{¶33} While acknowledging that there is no direct evidence that Brickman committed these acts, the circumstantial evidence is far from unconvincing. There is no real dispute that Brickman was in the immediate area of three of the incidents on the night of July 29-30: there is the testimony of Meade, Schultz, and Peterson, Brickman's vehicle, the fingerprint, and the cell phone tracking. That Brickman committed the acts is less definite, but certainly more convincing than the alternative that another person or persons unknown committed them. There was no manifest miscarriage of justice in the jury's inferring the identity of Brickman.

{¶34} The second assignment of error is without merit.

{¶35} For the foregoing reasons, Brickman's convictions are affirmed. Costs to be taxed against the appellant.


JOHN J. EKLUND, P.J.,

MARY JANE TRAPP, J.,

concur.


12

Case No. 2022-L-065