[Cite as *State v. Ray*, 2025-Ohio-2023.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                     |   | JUDGES:                       |
|---------------------|---|-------------------------------|
| STATE OF OHIO       | : | Hon. Craig R. Baldwin, P.J.   |
|                     | : | Hon. William B. Hoffman, J.   |
| Plaintiff-Appellee  | : | Hon. Kevin W. Popham, J.      |
|                     | : |                               |
| -vs-                | : |                               |
|                     | : | Case No. 2024 CA 00115        |
| IVAN LESTER RAY     | : |                               |
|                     | : |                               |
| Defendant-Appellant | : | OPINION                       |


CHARACTER OF PROCEEDING:    Appeal from the Stark County Court of
                            Common Pleas, Case No. 2024-CR-0765


JUDGMENT:                   June 5, 2025




DATE OF JUDGMENT ENTRY:     Affirmed

APPEARANCES:

For Plaintiff-Appellee                  For Defendant-Appellant

KYLE L. STONE                           CATHERINE MEECHAN
Prosecuting Attorney                    16855 Foltz Industrial Parkway
BY: CHRISTOPHER A. PIEKARSKI            Strongsville, OH 44149
Assistant Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

*Popham, J.,*

{¶1}   Defendant-Appellant Ivan Lester Ray ("Ray") appeals his convictions and sentences after a jury trial in the Stark County Court of Common Pleas.  For the following reasons, we affirm.

*Facts and Procedural History*

{¶2}   On May 1, 2024, the Stark County Grand Jury indicted Ray on four counts of aggravated arson in violation of R.C.  2909.02(A)(1)/(B)(2), felonies of the first degree; and one count of aggravated arson in violation of R.C. 2909.02(A)(2)/(B)(3), a felony of the second degree.

{¶3}   A jury trial began on June 21, 2024, during which the following evidence was presented.

{¶4}   M.F. ("husband") and T.F. ("wife") are married and live on Hoover Place NW, in Canton, Stark County, Ohio, with two children: fourteen-year-old H.F., and 10-month-old W.F. 1T. at 188.  Husband also has a six-year-old son, K., from a previous relationship with a woman named Krystal. Krystal is Ray's ex-wife and current girlfriend. 1T. at 190, 233, 254-255.

{¶5}   On the night of March 29, 2024, K. was at Krystal's home.  Husband and wife, and their other children, spent the evening at a friend's home and returned home between 10:30 p.m. and 11:00 p.m. 1T. at 190-191.  Husband and wife went to bed around 1:00 a.m. Wife got up around 1:45 a.m. to care for her 10-month-old child, W.F., and went back to bed around 2:00 a.m. 1T. at 192-195, 236.  Wife woke up again a short time later when W.F. began fussing.  At that point, she noticed

"everything was hazy" and she smelled smoke or something burning. 1T. at 195, 210.

{¶6} Wife woke husband, who searched the house and eventually saw flames on the front porch through a window. 1T. at 196-197, 210, 236-237. Husband called 9-1-1 while he and wife gathered the kids and exited through the back door. 1T. at 197, 237; State's Exhibit 1 (9-1-1 call).

{¶7} Outside, they met husband's father, D.F. ("father"), who lives two houses down, and another neighbor at the end of their driveway. 1T. at 197-198, 216-218, 238. Father testified that he had been awakened by one of the neighbor's children banging on his door to alert him to the fire. 1T. at 214-215, 217. Father asked husband if the water to the garden hose had been turned back on since winter. Husband then used the hose to try to extinguish the fire. 1T. at 198, 218, 238.

{¶8} Father told wife (his daughter-in-law) to check the footage from their Nest doorbell camera to see what caused the fire. 1T. at 198. In the footage recorded at 2:39 a.m., a person is seen pouring liquid over the side railing and onto the porch, and then setting it on fire. 1T. at 199, 201-202, 218, 239; State's Exhibit 3 (Nest video). Husband testified that when he first watched the Nest footage, he had a "suspicion" who the perpetrator was, but he was not entirely certain. 1T. at 239, 251.

{¶9} Father also reviewed his own Ring camera footage. At approximately 2:04 a.m., the footage showed someone walking toward husband and wife's house. 1T. at 220-222. Later footage showed the same person running down the alley at approximately 2:29 a.m. 1T. at 224. Father did not recognize the individual in the video.

{¶10} After watching his father's Ring video and seeing the suspect's "side profile," husband "knew right away" it was Ray. He testified: "As soon as I saw the video on that garage camera of my dad's, I knew. I had the suspicion on the [Nest] ones, but that [Ring] one, I immediately knew. I mean, I had no doubt who that was." 1T. at 266.

{¶11} Husband testified that Ray enjoys outdoor activities like hunting, fishing, and that Ray frequently wears camouflage hunting gear, just like the person shown in the videos. 1T. at 248- 249, 253. Husband recognized Ray based on the clothing and the person's profile. He "testified that he knew it was Ray because:

> The side profile of his face. I mean…initially, the whole thing…told me who it was, like I had no second guess, but the camo, the camouflage clothing…fits him and what he wears. I mean, I can't say [on] a daily basis, but [he] definitely wears it often.

1T. at 249, 252-253.

{¶12} Husband first met Ray in 2021. He testified that their interactions have been "a little bit tense" because husband has "majority custody" of K. 1T. at 234, 245, 255-256. According to husband, he and Krystal have had custody disputes nearly every year since K. turned one year old. 1T. at 265. They have gone to court multiple times as Krystal has sought increased parenting time. 1T. at 255. On March 29, 2024, the same day as the fire, husband filed a small claims action against Krystal seeking reimbursement from Krystal for her portion of K.'s preschool tuition. 1T. at 265. She was served the same day. 1T. at 266. Husband also testified to the ongoing issues with Krystal and his strong dislike for Ray.

{¶13} After the fire, husband admitted that he made a Facebook post describing what happened. In the post, he referred to Ray as a "lowlife piece of shit," and said he hoped Ray "burns in hell", that karma would catch up to him, and that he hopes Ray remembers "who he fucked with." 1T. at 259-262, 266; Defense Exhibit B (Facebook post). Husband also admitted that on July 18, 2021, he sent Krystal a text message stating: "Tell your child molester boyfriend he won't be around long." 1T. at 258, 261- 262; Defense Exhibit A (text message).

{¶14} Wife testified that she immediately recognized Ray when she watched her father-in-law's Ring camera footage. 1T. at 200. She explained:

[F]or one, he was wearing camo[uflage] and…that's all I've seen him in is camo. We know he likes to go hunting. And I could just tell - - I mean, when you see somebody that you know, you know that you know them[,] and I could tell by the profile of him, by the way he was walking, I just - - I knew exactly who it was.

1T. at 200, 207-209.

{¶15} After watching father's video, wife looked at her own Nest camera footage again. She saw Ray walking in front of her house earlier at 2:03 a.m., then walking in front of and beside father's house. 1T. at 201. She presumed that Ray must have walked around the block, because at 2:29 a.m., he again came from the same direction and walked up the side of their yard by the porch. 1T. at 201. She testified again that, after watching all the videos, she knew that the person who set the fire was Ray. 1T. at 205-206.

**{¶16}** Although husband and wife had multiple cameras on their home, the one on the side of the house where Ray stood while he set the fire was not working at the time because it was uncharged. 1T. at 202-203.

**{¶17}** Inspector Andrew Crawn, a Canton fire investigator, investigated the case. 2T. at 282-286. When he arrived at the scene, he took photos of the "heavy fire damage" to the porch. 2T. at 286-290; State's Exhibit's 21-42. He spoke with husband, wife, and father, and then reviewed both the Nest and Ring videos. 2T. at 290-292, 317.

**{¶18}** Inspector Crawn testified that, in the videos, he could see the suspect's general size, shape, walk, and in some instances, partial facial features. 2T. at 320-321. One of the videos showed the suspect pouring a flammable liquid over the side of the porch and lighting it, causing the fire. The flames spread to nearby combustibles including a chair, other furniture, flooring, knee wall, and the wooden porch structure. 2T. at 291-292; State's Exhibit 3 (Nest video). Based on the video, Inspector Crawn believed it was "100% likely" that an ignitable fluid was used. 2T. at 299. From his training and experience, Inspector Crawn classified the fire as "incendiary," meaning it was intentionally set in a place where a fire should not be. 2T. at 292-293.

**{¶19}** Inspector Crawn also testified that he frequently receives suspect identifications from victims and that, in this case husband and wife both identified Ray as the suspect in the videos. 2T. at 293, 319, 328.

**{¶20}** Later, Inspector Crawn returned to the scene after husband found a butane Coleman torch (in his lawn). 2T. at 294. The torch was clean and free of debris. Inspector Crawn testified there was a high probability that the torch had been used to start the fire. He took photos of the torch lying on the lawn, then collected it. 1T. at 243-245, 263-264;

2T. at 294-297; State's Exhibit 6 (torch) and 7-11 (photos). The torch was sent to the Fire Marshal's lab for testing. No fingerprints were found, but DNA samples were collected for analysis. 2T. at 297-298. The torch was also tested for flammable liquids, but those results came back negative. 2T. at 298-299.

{¶21} Inspector Crawn also reviewed video footage from three street cameras operated by the Crime Center in Canton. 2T. at 300-301. One camera, located at 18th Street NW and Cleveland Avenue, showed the suspect wearing camouflage and carrying a backpack, walking west across Cleveland Avenue. 2T. at 301-302; State's Exhibit 18 (18th & Cleveland video). Another camera, at 15th Street NW and Arnold Avenue NW, captured the same person a few blocks away, still wearing camo, a backpack, a hat, gloves, and boots, and walking south on Arnold. 2T. at 302; State 's Exhibit 19 (15th & Arnold video).

{¶22} Inspector Crawn testified that the suspect in those videos matched the suspect seen in the Nest and Ring videos. 2T. at 303. He also noted that something in or near the suspect's hands is seen giving off brief little flickers, or flashes of light, as he walked, crossed streets, and occasionally paused before continuing toward the victims' home. 2T. at 302-303; State's Exhibit 19 (15th & Arnold video).

{¶23} A third video from a camera located at Taggarts Ice Cream shop, showed the same suspect running northeast across the street, without his backpack. 2T. at 303-304; State's Exhibit 20 (14th & Fulton video). Inspector Crawn testified that a Ring camera at father's garage also captured the suspect fleeing west toward Fulton Road, still without his backpack. 2T. at 305, State's Exhibit 15 (Ring video, garage). According to Inspector Crawn, the backpack is important because it likely contained the accelerant

used to start the fire. He concluded that the backpack probably burned up in the fire since it never appeared in any subsequent footage. 2T. at 305.

{¶24} Hannah Smith testified that she is a crime analyst with the Canton Police Department. 2T. at 352-353. Smith works in the real-time Crime Center, which houses all the city's traffic cameras and license plate readers. 2T. at 353. Smith was asked by the Fire Prevention Bureau to review the city cameras in reference to the arson on Hoover Place NW. 2T. at 354. The suspect was described to her as a short white male, dressed in an "Army" jacket, carrying a backpack, and wearing black boots. 2T. at 355.

{¶25} Smith located footage of a suspect matching that description on several city cameras. 2T. at 355. A camera located at 15th Street NW and Arnold Avenue NW captured the suspect matching the description, i.e. wearing black or dark-colored boots, pants, a jacket with the hood up, and a book bag, walking southbound down the east side of Arnold. 2T. at 356; State's Exhibit 19 (15th & Arnold video). He eventually crossed the street and out of view of the camera, walking down Platinum Place NW. 2T. at 356-357; State's Exhibit 19 (15th & Arnold video). In another camera, positioned at Taggarts Ice Cream, located at 14th Street NW and Fulton Drive NW (State Route 687), the same suspect is seen running across 14th Street from the south to the north side, then continuing to run eastbound, eventually running up the little court down the street. 2T. at 357; State's Exhibit 20 (14th & Fulton video).

{¶26} Olivia McLaughlin is a laboratory technician in the State Fire Marshal's forensic lab. 2T. at 339. She testified that she received a butane torch for latent print and DNA analysis from the Canton Fire Department in reference to an arson that occurred on Hoover Place NW. 2T. at 340-341. She swabbed and processed the torch for latent

prints but found none. 2T. at 341-342, 346; State's Exhibit 6 (torch). McLaughlin explained that fingerprints may not be left on an item in the first place if gloves are worn or could be destroyed by heat or fire exposure. McLaughlin swabbed the torch's nozzle, on/off switch, and label for DNA, and submitted the samples to the Ohio Bureau of Criminal Investigation ("BCI") for testing. 2T. at 343-347; State's Exhibit 43 (DNA swab, nozzle & switch) and 44 (DNA swab, label).

{¶27} Andrew Sawin a forensic scientist and DNA analyst at BCI, was asked to perform DNA analyses in this matter. 2T. at 364-365, 373. Sawin recalled receiving two swabs from the State Fire Marshal to examine: one from a torch nozzle and on/off knob, and another from the torch's label. 2T. at 368, 373; State's Exhibit 43 (DNA swab, nozzle & switch) and 44 (DNA swab, label). DNA was present on the swab from the torch nozzle and on/off knob, but Sawin concluded that the DNA profile was "not of sufficient quality for comparison due to insufficient data." 2T. at 373-375; State's Exhibit 43 (DNA swab, nozzle & switch). DNA was also present on the swab from the torch's label, and it was sufficient for comparison. 2T. at 375-376; State 's Exhibit 44 (DNA swab, label). Sawin compared the DNA from the torch label to Ray's known DNA sample, and concluded to a reasonable degree of scientific certainty, that the DNA profile found on the torch's label was consistent with the DNA standard from Ray. 2T. at 376-377, 381, 389-392, 395-396. The estimated frequency of occurrence of the DNA profile was rarer than one in one trillion unrelated individuals. 2T. at 377, 395.

{¶28} The jury found Ray guilty of all charges. The trial court merged the second-degree felony aggravated arson charge in Count 5 into Count 1 for sentencing, and sentenced Ray to an indefinite aggregate minimum prison term of 28 years, up to a

maximum prison term of 31.5 years. The trial court further classified Ray as an arson offender.

*Assignments of Error*

**{¶29}** Ray raises four assignments of error,

**{¶30}** "I. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶31}** "II. APPELLANT'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."

**{¶32}** "III. APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUION AND ARTICLE 1 SECTION 10 OF THE OHIO CONSTITUION."

**{¶33}** "IV. THE TRIAL, COURT ERRED WHEN IT IMPOSED CONSECUTIVE SENTENCES."

I & II.

**{¶34}** Ray's first and second assignments of error are interrelated in that they challenge both the sufficiency and weight of the evidence; therefore, we address them together.

**Standard of Appellate Review – Sufficiency of the Evidence**

**{¶35}** The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, along with the Due Process Clause, requires the State to prove each element of a crime to a jury beyond a reasonable doubt. *United States v. Gaudin*, 515 U.S. 506, 509-10 (1995); *Hurst v. Florida*, 577 U.S. 92 (2016).

**{¶36}** Sufficiency of the evidence is a question of law reviewed de novo. *State v. Walker*, 2016-Ohio-8295, ¶ 30; *State v. Jordan*, 2023-Ohio-3800, ¶ 13. The review entails examining the elements of the offense and the evidence presented. *State v. Richardson*, 2016-Ohio-8448, ¶ 13.

**{¶37}** In assessing sufficiency, an appellate court does not weigh credibility. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded on other grounds by constitutional amendment as stated in State v. Smith, 80 Ohio St.3d 89, 102 n.4 (1997); Walker*, ¶ 30. The question is whether, viewing the evidence in the light most favorable to the prosecution, a rational jury could have found the defendant guilty beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001), citing *Jenks*; *see also Walker*, ¶ 31; *State v. Poutney*, 2018-Ohio-22, ¶ 19.

**{¶38}** A verdict will be upheld unless "reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Ketterer*, 2006-Ohio-5283, ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997); *accord State v. Montgomery*, 2016-Ohio-5487, ¶ 74.

**{¶39}** Further, the Supreme Court of Ohio has held that a failure to timely make a Crim.R. 29(A) motion during a jury trial does not waive an argument on appeal concerning the sufficiency of the evidence. *State v. Jones*, 91 Ohio St.3d 335, 346 (2001); *State v. Carter*, 64 Ohio St.3d 218, 223 (1992). In both *Jones* and *Carter*, the Supreme Court held that the defendant's "not guilty" plea preserves his right to object to the alleged insufficiency of the evidence. *Id.* We have previously recognized that a Crim.R. 29(A) motion is not necessary to preserve the issue of sufficiency of the evidence for appeal. *State v. Henderson*, 2014-Ohio-3121, ¶ 22 (5th Dist.), *citing State v. Straubhaar,* 2009-

Ohio-4757, ¶ 40 (5th Dist.).  *See also State v. Buckley*, 2017-Ohio-9358, ¶ 46 (5th Dist.). Moreover, because a conviction based on legally insufficient evidence constitutes a denial of due process, a conviction based upon insufficient evidence would almost always amount to plain error. *State v. Barringer*, 2006-Ohio-2649 at ¶ 59 (11th Dist.); *State v. Coe*, 153 Ohio App.3d 44, 48-49 (4th Dist. 2003); *State v. Lee*, 2016-Ohio-1045, ¶ 30 (5th Dist.).

**Issue for Appellate Review**: *Whether the evidence, viewed in the light most favorable to the prosecution, would convince a rational jury that Ray was guilty of aggravated arson*

**{¶40}**  The jury found Ray guilty of four counts of aggravated arson in violation of R.C.  2909.02(A)(1)/(B)(2), felonies of the first degree; and one count of aggravated arson in violation of R.C. 2909.02(A)(2)/(B)(3), a felony of the second degree.

**{¶41}**  There is no dispute that the aggravated arson as alleged in the indictment actually occurred. Ray's main argument is that the evidence was not sufficient to prove he was the person who started the fire.

**{¶42}**  The State must prove every element of the charged offense beyond a reasonable doubt, including the identity of the person who committed it.  *State v. Tate*, 2014-Ohio-3667, ¶ 15 (Internal citations omitted).  That identity can be established through either direct or circumstantial evidence. *Id.* at ¶19; *State v. Stearns*, 2024-Ohio-714, ¶ 27 (5th Dist.).

**{¶43}** Circumstantial evidence is defined as "'testimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved.'" *State v.*

*Nicely*, 39 Ohio St.3d 147,150 (1988), *quoting* Black's Law Dictionary (5th Ed. 1979). This Court has noted that arson cases often lack eyewitnesses. In such cases, circumstantial evidence alone can be strong enough to support a conviction. *State v. Hall*, 2005-Ohio-4403, ¶31 (5th Dist.).

{¶44} Examples of circumstantial evidence that can help establish identity include the defendant's presence or fingerprints at or near the crime scene, as well as the motive and opportunity to commit the crime. *State v. Sanders*, 2012-Ohio-400, ¶ 39 (11th Dist.) ("[i]dentification of the shooter is not necessary when there is circumstantial evidence of appellant's presence at the scene during the time of the incident"); *State v. Reese*, 2004-Ohio-6674, ¶ 15 (2d Dist.) ("[t]he identity of the perpetrator may be proved by circumstantial evidence, such as a fingerprint found at the crime scene"); *State v. Reddy*, 2010-Ohio-3892, ¶ 18 (10th Dist.) ("reasonable minds could conclude that appellant had the opportunity and motive to set Copeland's car on fire and, therefore, was the person who set Copeland's car on fire"); *State v. Brickman*, 2023-Ohio-2031, ¶ 24 (11th Dist.).

{¶45} In this case, the State presented evidence that Ray may have had a motive due to the ongoing custody issues involving wife, husband, and Krystal. Both wife and husband identified Ray as the person shown in video footage starting the fire. As described in our Statement of Facts, surveillance video from the victims' home, father's home, and the City of Canton show a person approaching the home, pouring liquid on the porch, setting it on fire, and leaving the scene. DNA recovered from a label on a butane torch found at the scene was tested and found to be consistent with Ray's DNA.

{¶46} Viewing this evidence in a light most favorable to the prosecution, we find that a reasonable jury could conclude beyond a reasonable doubt that Ray was the

person who started the fire.  The State, therefore, met its burden of producing evidence for each element of the offense, including the identification of Ray as the perpetrator. Accordingly, there was sufficient evidence to submit the charges to the jury and to support Ray's conviction.

{¶47}  In his second assignment of error, Ray contends that his conviction is against the manifest weight of the evidence.

**Standard of Appellate Review – Manifest Weight of the Evidence**

{¶48}  The term "manifest weight of the evidence" relates to persuasion.  *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19.  It concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 n.4 (1997)*; *State v. Martin*, 2022-Ohio-4175, ¶ 26.

{¶49}  When reviewing the manifest weight of the evidence, the question is whether the jury clearly lost its way in resolving conflicts, resulting in a manifest miscarriage of justice, even if the evidence is legally sufficient.  *Thompkins*, 78 Ohio St.3d at 386 - 387; *State v. Issa*, 93 Ohio St.3d 49, 67 (2001).  In this role, an appellate court acts as a "thirteenth juror" and may disagree with the jury's assessment of conflicting testimony.  *State v. Jordan*, 2023-Ohio-3800; *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982); *State v. Wilson*, 2007-Ohio-2202, ¶ 25.

{¶50}  Appellate courts traditionally presume the jury's assessment is correct, given its ability to observe witnesses' demeanor, gestures, and tone, all critical factors in

evaluating credibility. *Eastley*, 2012-Ohio-2179, ¶ 21; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

**{¶51}** However, the Eighth District recently noted in *State v. Reillo*, 2024-Ohio-3307, ¶ 20, *appeal allowed,* 2025-Ohio-705 (Table), that *Eastley* arguably extended this presumption from civil to criminal cases. *Id.* at ¶ 27. The court cautioned that deferring to credibility determinations would collapse the distinction between sufficiency and weight of the evidence. *Reillo* at ¶ 23. It observed that if credibility findings were insulated from review, there would be little reason to raise a manifest-weight challenge. *Id. See also State v. Butler*, 2024-Ohio-5879, ¶ 27 (5th Dist.). Thus, acting as a thirteenth juror, the appellate court reviews credibility de novo. *Id. See also State v. Cox*, 2025-Ohio-1819, ¶38 (5th Dist.); *State v. Soto,* 2025-Ohio-1788, ¶42 (5th Dist.); *State v. Beal,* 2025-Ohio-1666, ¶29 (5th Dist.).

**{¶52}** A manifest-weight claim succeeds only in "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

**{¶53}** To reverse a conviction on manifest-weight grounds, all three judges on the appellate panel must concur. Ohio Const., Art. IV, § 3(B)(3); *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶¶ 2-4, citing *Thompkins*, syllabus ¶ 4.

**Issue for Appellate Review**: Whether *the jury clearly lost its way and created such a manifest miscarriage of justice that Ray's convictions for aggravated arson must be reversed and a new trial ordered*

**{¶54}** After reviewing the entire record and weighing the evidence and all reasonable inferences as a thirteenth juror, including the credibility of the witnesses, we conclude that the jury did not lose its way or cause a manifest miscarriage of justice.

**{¶55}** Although evidence of animosity and bias by husband and wife toward Ray was introduced at trial, we are not persuaded that this alone makes their identification of Ray unreliable. The testimony of husband and wife was corroborated by video footage showing the suspect approach the victims' home, pour liquid on the porch, ignite the liquid, and leave the area. DNA recovered from the label of the butane torch was tested and found to be consistent with Ray's DNA.

**{¶56}** The jurors had the opportunity to observe Ray during the trial and compare his appearance to the individual shown in the video footage recorded as the events occurred.

**{¶57}** The record contains no compelling evidence that weighs heavily against Ray's convictions. We find that the greater weight of the credible evidence produced at trial supports the jury's conclusion that Ray committed the offenses. Accordingly, we find no indication that the jury lost its way or ignored substantial evidence in reaching its verdict.

**{¶58}** Ray's first and second assignments of error are overruled.

III.

**{¶59}** In his third assignment of error, Ray argues that he was denied effective assistance of trial counsel.

**{¶60}** To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. First, a defendant must show that trial counsel's representation was

ineffective, specifically that it fell below an objective standard of reasonable representation and violated an essential duty to the client. *Strickland v. Washington*, 466 U.S. 668 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

**{¶61}** Even if the defendant establishes deficient performance, he or she must also satisfy the second prong of the *Strickland* test by showing prejudice. That is, the defendant must demonstrate that counsel's errors were so serious as to undermine the reliability of the trial's outcome. *Id.* This requires a showing that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. *Id. See also State v. Harris*, 2024-Ohio-2993, ¶¶ 28-29 (5th Dist.)

**{¶62}** Ray argues that trial counsel was ineffective for failing to file a jury demand and for failing to move for acquittal under Crim.R. 29(A). *Appellant's brief at 10.*

**{¶63}** Ray received a jury trial. Therefore, even assuming that counsel failed to file a jury demand, Ray has not shown prejudice under the second prong of *Strickland*.

**{¶64}** As discussed in our resolution of Ray's first and second assignments of error, his convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. Therefore, because a Crim.R. 29(A) motion would not have been granted, Ray cannot show that he was prejudiced by counsel's failure to make such a motion.

**{¶65}** Ray's third assignment of error is overruled.

IV.

{¶66} Ray argues in his fourth assignment of error that the trial court erred in imposing consecutive sentences. Specifically, he contends that the record does not support a finding that the harm caused by the offenses was so great or unusual as to support consecutive sentences under R.C. 2929.14 (C)(4)(b).

**Standard of Review**

{¶67} A court reviewing a criminal sentence is required by R.C. 2953.08 (F) to review the entire trial-court record, including any oral or written statements and Presentence Investigation Reports. R.C. 2953.08 (F)(1) through (4). We review felony sentences using the standard of review set forth in R.C. 2953.08. *State v. Jones*, 2020-Ohio-6729, ¶ 36; *State v. Howell*, 2015-Ohio-4049, ¶ 31 (5th Dist.). R.C. 2953.08 (G)(2) provides we may either increase, reduce, modify, or vacate a sentence and remand for resentencing where we clearly and convincingly find that either the record does not support the sentencing court's findings under R.C. 2929.13 (B) or (D), 2929.14 (B)(2)(e) or (C)(4), or 2929.20 (I), or the sentence is otherwise contrary to law. *See also State v. Bonnell*, 2014-Ohio-3177, ¶ 28.

{¶68} Contrary to law, as defined in legal dictionaries, e.g., Black's Law Dictionary 328 (6th Ed.1990), means "in violation of statute or legal regulations at a given time[.]" *State v. Jones*, 2020-Ohio-6729, ¶ 34.

{¶69} "Clear and convincing evidence" is that evidence "which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. *See also In re Adoption of Holcomb*, 18 Ohio St.3d 361 (1985), *superseded by statute on*

*other grounds as stated by In re Adoption of T.R.S., 2014-Ohio-3808, ¶¶ 16-17 (7th Dist.), and In re Adoption of A.L.S., 2018-Ohio-507, ¶23 (12th Dist.).* "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the jury had sufficient evidence before it to satisfy the requisite degree of proof."  *Cross*, 161 Ohio St. at 477.

**{¶70}**  Under *State v. Jones*, 2020-Ohio-6729, ¶ 39, R.C. 2953.08(G)(2)(b) does not authorize appellate courts to modify or vacate a sentence based solely on disagreement with the trial court's weighing of factors under R.C. 2929.11 and 2929.12. *See also State v. Toles,* 2021-Ohio-3531, ¶ 10 (Brunner, J., concurring).

**{¶71}**  However, when a trial court imposes a sentence based on considerations extraneous to R.C. 2929.11 and 2929.12, the sentence is contrary to law and reviewable. *State v. Bryant*, 2022-Ohio-1878, ¶ 22.

*Consecutive sentences*

**{¶72}**  Under Ohio's statutory sentencing scheme, there is a presumption that a defendant's multiple prison sentences will be served concurrently, R.C. 2929.41 (A), unless certain circumstances not applicable in this case apply, see, e.g., R.C. 2929.14 (C)(1) through (3), or the trial court makes findings supporting the imposition of consecutive sentences under R.C. 2929.14 (C)(4), which provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness

of the offender's conduct and to the danger the offender poses to the public,
and if the court also finds *any* of the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section R.C. 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. (Emphasis added).

{¶73} Conformity with R.C. 2929.14 (C)(4) requires the trial court to make the statutory findings at the sentencing hearing, which means that "'the [trial] court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and specifie[d] which of the given bases warrants its decision.'" *State v. Bonnell*, 2014-Ohio-3177, ¶ 26, *quoting State v. Edmonson*, 86 Ohio St.3d 324, 326 (1999). To this end, a reviewing court must be able to ascertain from the record evidence to support the trial court's findings. *Bonnell,* ¶ 29.

{¶74} "A trial court is not, however, required to state its reasons to support its findings, nor is it required to give a rote recitation of the statutory language, 'provided that

the necessary findings can be found in the record and are incorporated in the sentencing entry.'" *State v. Sheline*, 2019-Ohio-528, ¶ 176 (8th Dist.), *quoting Bonnell,* ¶ 37; *Jones*, 2024-Ohio-1083, ¶ 14.

**Issue for Appellate Review:** *Whether the consecutive-sentence findings under R.C. 2929.14 (C)(4) have been made, i.e., the first and second findings regarding necessity and proportionality, as well as the third required finding under R.C. 2929.14 (C)(4)(a), (b), or (c)*

**R.C. 2929.14 (C)(4)**: *[T]he court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public*

**{¶75}** In the case at bar, the trial court made this finding during the sentencing hearing and in his judgment entry. Sent. T. at 20; *Entry*, filed July 11, 2024 at 2.

**R.C. 2929.14 (C)(4)(a)**: *The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense*

**{¶76}** This factor does not apply in Ray's case.

**R.C. 2929.14 (C)(4)(b)**: *At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses committed was so great or unusual that no single prison term for any*

*of the offenses committed as part of any of the courses of conduct adequately reflects*

*the seriousness of the offender's conduct*

**{¶77}** In the case at bar, the trial court made this finding during the sentencing hearing and in his judgment entry. Sent. T. at 20; *Entry*, filed July 11, 2024 at 2.

***R.C. 2929.14 (C)(4)(c)****: The offender's history of criminal conduct demonstrates*

*that consecutive sentences are necessary to protect the public from future crime by the*

*offender*

**{¶78}** In the case at bar, the trial court made this finding in his judgment entry. *Entry* filed July 11, 2024 at 3. However, during the sentencing hearing, the trial court noted that Ray had no prior felony criminal record, and it was taking that into account in sentencing. Sent. T. at 19.

**{¶79}** A trial court need only make one of the three findings under R.C. 2929.14 (C)(4)(a) - (c) to support the imposition of consecutive sentences. *State v. Bates*, 2024-Ohio-2587, ¶ 42 (8th Dist.); *State v. Gales,* 2023-Ohio-2753, * 89-90 (9th Dist.); *State v. Stutes,* 2023-Ohio-4582, ¶ 31 (4th Dist.); *State v. Parrish,* 2023-Ohio-2409, ¶ 24 (2d Dist.); *State v. Malcolm*, 2022-Ohio-4708, ¶ 13 (5th Dist.). In this case, the trial court made the necessary findings under R.C. 2929.14(C)(4)(b).

**Issue for Appellate Review:** *Whether the trial judge's decision to impose*

*consecutive sentences in Ray's case is supported by the record*

**{¶80}** According to the Supreme Court of Ohio, "the record must contain a basis upon which a reviewing court can determine that the trial court made the findings required by R.C. 2929.14 (C)(4) before it imposed consecutive sentences." *Bonnell*, 2014-Ohio-3177 at ¶ 28. "[A]s long as the reviewing court can discern that the trial court engaged in

the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell*, ¶ 29.

**{¶81}** Here, the case involved four different victims, husband, wife, and their two minor children, W.F. and H.F. Where there are multiple victims, the imposition of consecutive sentences is reasonable in order to hold the defendant accountable for crimes committed against each victim. *See, e.g., State v. Sexton,* 2002-Ohio-3617, ¶ 67 (10th Dist.); *State v. Sparks,* 2024-Ohio-2362, ¶ 18 (8th Dist.); *State v. Thome,* 2017-Ohio-963, ¶16 (8th Dist.).

**{¶82}** Representation for each of the victims factored into the trial court's decision here to impose consecutive sentences. Husband, wife, and their child H.F. each spoke at sentencing about their fear, the emotional distress, and the monetary loss caused by Ray's actions.

**{¶83}** Upon review, we find that the trial court's sentencing on the charges follows applicable rules and sentencing statutes. The sentence was within the statutory sentencing range, and Ray has not shown that the trial court imposed the sentence based on impermissible considerations. Further, the record has evidence supporting the trial court's findings under R.C. 2929.14 (C)(4). Therefore, we have no basis for concluding that it is contrary to law.

**{¶84}** Ray's fourth assignment of error is overruled.

{¶85} The judgment of the Stark County Court of Common Pleas is affirmed.

By Popham, J.,

Baldwin, P.J., and

Hoffman, J., concur