[Cite as *State v. Sheppard*, 2025-Ohio-2747.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. William B. Hoffman, P.J. |
|  | : | Hon. Kevin W. Popham, J. |
| Plaintiff-Appellee | : | Hon. David M. Gormley, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2025 CA 0001 |
| TRAMEL SHEPPARD | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of
                             Common Pleas, Case No. 2024CR1747

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      August 4, 2025

APPEARANCES:

For Plaintiff-Appellee              For Defendant-Appellant

KYLE L. STONE
Stark County Prosecutor             BERNARD HUNT
BY VICKI L. DESANTIS                2395 McGinty Road N.W.
Assistant Prosecutor                North Canton, OH 44720
110 Central Plaza S., 5th Floor
Canton, OH  44702

*Popham, J.,*

{¶1}    Defendant-Appellant Tramel Antwan Sheppard ("Sheppard") appeals his conviction and sentence after a jury trial in the Stark County Court of Common Pleas.  For the reasons below, we affirm.

### Facts and Procedural History

{¶2}    On August 20, 2024, the Stark County Grand Jury returned an indictment charging Sheppard with one count of violating a protection order, a third-degree felony in violation of R.C. 2919.27(A)(2)/(B)(4), and three counts of menacing by stalking, fourth degree felonies in violation of R.C. 2903.211(A)(1)/(B)(2)(a), (e), and (g).

{¶3}    A two-day jury trial commenced on November 13, 2024, during which the following evidence was presented.

### The Victim's Testimony

{¶4}    T.R. testified that she met Sheppard in 2022 while both were employed at Shearer's.  1T. at 105[1].  T.R. testified that she invited Sheppard to her church.  *Id.* at 107.  T.R. testified that when Sheppard asked her out on a date, T.R. declined, responding, "I'm God's girl.  I'm going with the Lord." *Id.* at 123.  T.R. never gave Sheppard her phone number or address.  *Id.*

{¶5}    T.R. testified that Sheppard made her uncomfortable at work on multiple occasions.  T.R. testified, if she was napping in the break room, or resting her head in the office due to a headache, Sheppard would begin massaging her.  *Id.* at 107-108.  After the second incident, when Sheppard laughed, T.R. testified that she told him, "That's not funny.  Stop." *Id.* at 108.  T.R. also testified that Sheppard asked her for sex, said she

---

[1] For clarity, the transcript of Sheppard's jury trial will be referred to as "__T.__" signifying the volume and page number.

owed him children, and threatened, "I'm going to get you." *Id.* Despite T.R. repeatedly telling him she was not interested, Sheppard continued his behavior, prompting T.R. to report him to their employer. Shortly thereafter, Sheppard was terminated from his employment. *Id.* at 109.

{¶6} T.R. further testified that Sheppard began causing disruptions at her church. During a service, he proposed to her in front of the congregation. 1T. at 110. T.R. testified that she was startled and confused, as they had never been romantically involved. T.R. testified that Sheppard later became aggressive with the church pastor, and T.R. began avoiding Sheppard. T.R. testified that, on one occasion, her cousin had to intervene and tell Sheppard to leave her alone. *Id.* at 111. T.R. testified that, on another occasion, while T.R. was walking her grandmother to the car, Sheppard attempted to speak to her. T.R. testified that she told him, "No, don't talk to me. I'm taking my grandma out to the car. Leave me alone." *Id.* T.R. testified that Sheppard was asked to not return to the church. *Id.*

{¶7} T.R. testified she never dated Sheppard, never had drinks with him, never expressed romantic interest, and told him multiple times to leave her alone. 1T. at 111.

{¶8} T.R. testified that due to the ongoing harassment, she filed a complaint and obtained a civil protection order (CPO), effective February 1, 2024, through February 1, 2029. The CPO prohibited any contact between Sheppard and T.R. 1T. at 112-113; State's Exhibit 18.

{¶9} T.R. testified that despite the CPO she began receiving letters from Sheppard, even though she had never provided him with her address. 1T. at 113. Between April and August 2024, she received seventeen such letters. *Id.* at 113-114; 2T.

at 207; State's Exhibits 1-17. Some letters were signed by Sheppard, while others were purportedly from "God." *Id.* at 114, 119. T.R. testified that Sheppard wrote in the letters that he was coming to see her, that they would be together soon, and acknowledged they could not live together because of the CPO. *Id.* at 117-118. T.R. testified that she filed a report with the Stark County Sheriff's Office. *Id.* at 114. T.R. testified that on another occasion, Sheppard showed up at her home, prompting her to contact the police. *Id.* at 123.

{¶10} T.R. testified that the letters made her feel anxious, uncomfortable, and unsafe, as it seemed Sheppard did not respect the legal protections in place. 1T. at 115-117. T.R. testified that the experience has caused her ongoing anxiety, negatively impacted her relationships, and left her in fear for her safety. *Id*. at 116-117, 123.

*Sheppard's Testimony*

{¶11} Sheppard testified that he wrote the letters in an attempt to build a relationship with T.R. 2T. at 151. Acknowledging that the CPO barred him from her home, he testified the letters were his alternative means of contact. 2T. at 160.

{¶12} When asked why he identified himself as "God," Sheppard testified it was an emotional decision and that being "God" was significant in his relationship with T.R., although he claimed he would not impose his beliefs on others. 2T. at 152-153. Sheppard testified the CPO did not apply to him because he was "God," though he conceded that the order listed his legal name. 2T. at 156.

{¶13} Sheppard testified that he only referred to himself as "God" with T.R.:

> Um, at first she said that she was my girl, like when we worked
> together, and I kind of looked at her strange. Then she was like, Oh, I'm

God's girl.  And I kind of like, wait, ran from her cause I was, I was scared for the simple fact that I didn't know like how she would know who I was, like who told her about me? Who even know (sic) what happened to me?

2T. at 158.  Sheppard further testified,

A.  No, she wants a relationship with God, and that's what I'm trying to give her.

Q.  But she doesn't want one with Tramel Sheppard?

A.  Correct.

2T. at 161-162.

Sheppard denied any intent to harm T.R.,

Q.  And your intention with that would be?

A.  Um, nothing harmful, like nothing harmful or nothing, or anything like that, just like wanting to love her.

Q.  And you would never say or do anything to harm her?

A.  No.

Q.  And that includes making her feel emotionally distressed?

A.  Correct.

Q.  And if she were to feel emotionally distressed, it was not your intent?

A.  Correct.

Q.  And you would not do so knowingly?

A.  No.  Never, never my intention to like make her distressful or anything like that.

Q.  What did you believe the consequences, if any, of writing the letters would be?

A. Honestly, I really didn't think about the consequences 'cause I felt like I was doing the right thing.

Q.  Okay.  Why did you feel like you were doing the right thing?

A.  Because I was being myself.

Q.  And it's not part of your character to ever cause harm to anyone?

A. No.

2T. at 153-154.

{¶14}  Sheppard testified that he had a prior conviction for menacing by stalking last year (2023), and a prior conviction for felonious assault in Summit County in 2010. 2T. at 159.

*The Verdict and Sentence*

{¶15}  The jury found Sheppard guilty of all charges.  On November 18, 2024, the trial court  held a sentencing hearing.

{¶16}  The trial court sentenced Sheppard to 36 months for violation of a civil protection order and 12 months for one count of menacing by stalking, with those sentences to be served concurrently.  For purposes of sentencing, the court merged the remaining two counts of menacing by stalking.  *Judgment Entry of Conviction and Sentence*, Dec. 4, 2024.

*Assignments of Error*

{¶17}  Sheppard raises two assignments of error,

{¶18} "I. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶19} "II. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RENEW ITS MOTION FOR ACQUITTAL AT THE CLOSE OF ALL EVIDENCE."

I.

{¶20} Sheppard maintains his convictions are against the manifest weight of the evidence, arguing that the state failed to present sufficient evidence that he recklessly violated the protection order, and that he knowingly caused T.R. to believe he would cause her mental distress, [which is] the required *mens rea* for a finding of guilt to menacing by stalking. (Appellant's brief at 7; 9).

**Standard of Appellate Review –Manifest Weight of the Evidence**

{¶21} The term "manifest weight of the evidence" relates to persuasion. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. It concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 n.4 (1997); *State v. Martin*, 2022-Ohio-4175, ¶ 26.

{¶22} When reviewing the manifest weight of the evidence, the question is whether the jury clearly lost its way in resolving conflicts, resulting in a manifest miscarriage of justice, even if the evidence is legally sufficient. *Thompkins* at 387; *State v. Issa*, 93 Ohio St.3d 49, 67 (2001).

{¶23} Appellate courts have traditionally presumed the jury's assessment is correct, given its ability to observe witnesses' demeanor, gestures, and tone, all critical

factors in evaluating credibility. *Eastley* at ¶ 21; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). As the *Eastley* Court noted, "If the evidence is susceptible to more than one interpretation, the reviewing court is bound to adopt the one most consistent with the verdict and judgment, and most favorable to sustaining them."

{¶24} The Supreme Court of Ohio reiterated that an appellate court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *State v. Jordan*, 2023-Ohio-3800, ¶ 17. The Court specifically directed, "'Sitting as the "thirteenth juror,"' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion." *Id.*, *citing State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶25} A manifest-weight claim succeeds only in "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387 [internal quotations omitted].

{¶26} To reverse a conviction on manifest-weight grounds, all three judges on the appellate panel must concur. Ohio Const., Art. IV, § 3(B)(3); *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶¶ 2-4, citing *Thompkins*, syllabus ¶ 4.

**Issue for Appellate Review**: Whether *the jury clearly lost its way and created such a manifest miscarriage of justice that Sheppard's convictions for violating a protection order and menacing by stalking must be reversed and a new trial ordered.*

*Violating a Protection Order – R.C. 2919.27(A)(2)*

{¶27}  Sheppard was convicted of violating a protection order.  R.C. 2919.27(A)(2) provides that:

> No person shall recklessly violate the terms of [a] protection order issued pursuant to section 2151.34, 2903.213, or 2903.214 of the Revised Code.

{¶28}  A violation of R.C. 2919.27(A)(2) is elevated to a third-degree felony under R.C. 2919.27(B)(4) if the violation is committed while the offender is engaged in a felony.

{¶29}  Sheppard argues that the state failed to prove beyond a reasonable doubt that he acted "recklessly." (Appellant's brief at 7-8).  Sheppard contends that the State presented no evidence that he acted indifferently to the consequences of his actions, or that he disregarded a risk that his conduct was likely to cause a certain result.  (Appellant's brief at 7).

{¶30}  Here, the trial court instructed the jury as follows,

> Recklessly.   A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result.  A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
>
> "Risk" means a significant possibility as contrasted with a remote possibility that a certain result may occur.

2T. at 165-166.

**{¶31}** The Eighth District has observed,

> The legislature intentionally based the definition of "recklessness" on the likelihood, rather than the probability, of a certain result. *State v. Young*, 2005-Ohio-3584, (8th Dist.) *citing* R.C. 2901.22(C) Staff Notes. "Something is 'probable' when there is more reason for expectation or belief than not, whereas something is 'likely' when there is merely good reason for expectation or belief." *Id*.

*State v. Hardman*, 2016-Ohio-498, ¶ 38 (8th Dist.). The defendant's awareness of the likelihood of the result is the key. "'If the result is probable, the person acts "knowingly;" if it is not probable, but only possible, the person acts "recklessly" if he chooses to ignore the risk.'" *In re Judicial Campaign Complaint Against Emrich,* 75 Ohio St.3d 1517, 1519 (1996), *quoting State v. Edwards*, 83 Ohio App.3d 357, 361 (10th Dist. 1992); *State v. Clay*, 2008-Ohio-6325, ¶ 32 (Lanzinger, J., concurring); *State v. Ashcraft,* 2023-Ohio-2378, ¶ 23 (5th Dist.); *State v. Hunter*, 2021-Ohio-1714, ¶ 28 (5th Dist.). In other words, a person acts "recklessly" when he or she is aware that there is a substantial and unjustifiable risk, or chance, that the proscribed result will occur and nevertheless chooses to engage in the act and run the risk.

**{¶32}** Criminal intent is usually a question of fact for determination by the jury and can be inferred from facts and circumstances reasonably tending to manifest a mental attitude. *Morissette v. United States*, 342 U.S. 246, 274 (1952); S*tate v. Wallen*, 21 Ohio App.2d 27, 35 (5th Dist. 1969). The intent with which an act is committed may be inferred from the act itself and the surrounding circumstances, including acts and statements of a

defendant. *State v. Garner,* 74 Ohio St.3d 49, 60 (1995); *Wallen*, 21 Ohio App.2d at 34; *Ashcraft,* ¶ 22.

{¶33} Here, Sheppard admitted that he intentionally wrote the letters to T.R. because he wanted to have a romantic relationship with her. 2T. at 151. Sheppard further testified that he knew a CPO barred him from having contact with T.R. Sheppard testified that he then began referring to himself as "God," exclusively to T.R., because the CPO did not apply to "God." 2T. at 156. Sheppard testified that he knew T.R. did not want a relationship with Tramel Sheppard. 2T. at 161-162. Sheppard testified that he disregarded the consequences of his actions in writing to T.R. 2T. at 153-154.

{¶34} The jury was aware that T.R. reported Sheppard's unwanted advances to her employer, and that the employer subsequently terminated Sheppard's employment. The jury heard testimony that T.R.'s cousin and pastor intervened on her behalf and told Sheppard to leave T.R. alone. The jury heard testimony that T.R. obtained a CPO to keep Sheppard away from her.

{¶35} The jury could reasonably conclude that Sheppard was aware of the risk his conduct posed and that he disregarded it. His own testimony supports such a finding: he knew the order was in place, understood its terms, and nonetheless chose to communicate with T.R. repeatedly. Moreover, T.R.'s testimony and other evidence, such as reports to her employer, law enforcement, and the court, establish that Sheppard was repeatedly warned to cease contact, yet persisted in his communications.

{¶36} There is substantial evidence, set forth in full above, from which a reasonable inference of Sheppard's recklessness may be drawn. S*tate v. Wallen*, 21 Ohio App.2d at 35.

{¶37}   For these reasons, we conclude that a reasonable person could have found beyond a reasonable doubt that Sheppard did recklessly violate the terms of a protection order.   We find, therefore, that the state met its burden of production regarding each element of the crime of violating a protection order for which Sheppard was indicted and, accordingly, there was sufficient evidence to submit the charge to the jury and to support Sheppard's conviction.

*Menacing by Stalking – R.C. 2903.211(A)(1)*

{¶38}   Sheppard was also convicted of menacing by stalking in violation of R.C. 2903.211(A)(1), which states:

> (A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.
>
> …
>
> (B) Whoever violates this section is guilty of menacing by stalking.

…

(2) Menacing by stalking is a felony of the fourth degree if any of the following applies:

(a) The offender previously has been convicted of or pleaded guilty to a violation of this section or a violation of section 2911.211 of the Revised Code.

…

(e) The offender has a history of violence toward the victim or any other person.

…

(g) At the time of the commission of the offense, the offender was the subject of a protection order.

{¶39} R.C. 2901.22(B) sets forth the definition of how and when a person acts knowingly,

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶40} Whether a person acts knowingly can only be determined, absent a defendant's admission, from all the surrounding facts and circumstances, including the doing of the act itself. *State v. Johnson*, 56 Ohio St.2d 35, 38 (1978) *citing State v. Huffman*, 131 Ohio St. 27 (1936); *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991).

{¶41} The jury heard evidence that Sheppard's unwanted advances toward T.R. began while the two were co-workers. The unwanted conduct continued at their mutual church. Sheppard admitted that he intentionally wrote the letters to T.R., because he wanted to have a romantic relationship with her. 2T. at 151. Sheppard further testified that he knew a CPO barred him from having contact with T.R. Sheppard testified that he then began referring to himself as "God," exclusively, to T.R., and the CPO did not apply to "God." 2T. at 156. Sheppard testified that he knew T.R. did not want a relationship with Tramel Sheppard. 2T. at 161-162. Sheppard testified that he disregarded the consequences of his actions in writing to T.R. 2T. at 153-154.

{¶42} T.R. testified that she filed a report with the Stark County Sheriff's Office when Sheppard appeared unannounced at her home. T.R. further testified that she obtained a CPO barring Sheppard from contacting her. T.R. testified that the experience has caused her ongoing anxiety, negatively impacted her relationships, and left her in fear for her safety. 1T. at 116-117, 123.

{¶43} We conclude that a reasonable person could have found beyond a reasonable doubt that Sheppard, while a CPO was in effect, did knowingly engage in a pattern of conduct that caused T.R. mental distress. We find, therefore, that the state met its burden of production regarding each element of the crime of menacing by stalking

for which Sheppard was indicted and, accordingly, there was sufficient evidence to submit the charge to the jury and to support Sheppard's conviction.

{¶44} The jurors had the opportunity to observe T.R. and Sheppard during the trial. Each was subjected to cross-examination.

{¶45} Upon review of the entire record, weighing the evidence and all reasonable inferences as a thirteenth juror, including considering the credibility of the witnesses, we find that the record contains no compelling evidence weighing heavily against Sheppard's convictions. Rather, we find the greater amount of credible evidence produced at trial, particularly Sheppard's own admissions, supports the jury's verdict on both counts. Accordingly, we find no indication that the jury lost its way or ignored substantial evidence in reaching its verdict.

{¶46} Sheppard's first assignment of error is overruled.

II.

{¶47} In his second assignment of error, Sheppard contends that his trial counsel was ineffective in not renewing the Crim.R. 29(A) motion for acquittal at the completion of the evidence.

{¶48} To succeed on a claim of ineffectiveness of counsel, a defendant must satisfy a two-prong test. First, a defendant must show that trial counsel's representation was ineffective, specifically that it fell below an objective standard of reasonable representation and violated an essential duty to the client. *Strickland v. Washington*, 466 U.S. 668 (1984). In assessing such claims, a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.* at 690.

{¶49} Even if the defendant shows deficient performance, he or she must also satisfy the second prong of the *Strickland* test by showing prejudice. That is, the defendant must demonstrate that counsel's errors were so serious as to undermine the reliability of the trial's outcome. *Strickland* at 694. This requires a showing that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. *Id. See also State v. Harris*, 2024-Ohio-2993, ¶¶ 28-29 (5th Dist.)

{¶50} Here, even assuming deficiency, Sheppard cannot show prejudice. The Supreme Court of Ohio has held that failure to renew a Crim.R. 29(A) motion does not waive sufficiency challenges on appeal. *State v. Jones*, 91 Ohio St.3d 335, 346 (2001); *State v. Carter*, 64 Ohio St.3d 218, 223 (1992). *See also, State v. Lee,* 2016-Ohio-1045, ¶ 30 (5th Dist.); *State v. Ray,* 2025-Ohio-2023, ¶ 39 (5th Dist.). As set forth above, this Court concluded that Sheppard's convictions are supported by sufficient evidence and were not against the manifest weight of the evidence. Therefore, because a Crim. R. 29(A) motion would not have been granted, Sheppard cannot show that he was prejudiced by counsel's failure to renew such a motion at the conclusion of the evidence.

{¶51} Sheppard's second assignment of error is overruled.

**{¶52}** The judgment of the Stark County Court of Common Pleas is affirmed.

By Popham, J.,

Hoffman, P.J, and

Gormley, J., concur;